**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

**Robyn J. Dennison,**

**Case No. 1:25-cv-02243**

      **Plaintiff,**

      **-vs-**

**JUDGE PAMELA A. BARKER**

**Packaging Corporation of America,**

      **Defendant.**

**MEMORANDUM OPINION & ORDER**

Currently pending before the Court is Defendant Package Corporation of America's ("Defendant") Motion to Dismiss Plaintiff's Complaint (the "Motion"). (Doc. No. 8.) Plaintiff Robyn J. Dennison's ("Plaintiff") filed a Memorandum in Opposition to the Motion (the "Opposition"), and Defendant filed its Reply in Support of the Motion (the "Reply") (Doc. Nos. 10, 11.) For the following reasons, the Motion is granted in part and denied in part.

**I.     Background**

     **A. Factual Allegations**

Defendant produces "corrugated cardboard box products for the packaging and shipping industry." (Doc. No. 7, ¶ 6.) Defendant "had approximately 13,000 employees between 95 locations." (*Id.*, ¶ 7.) Defendant owns and operates a facility in Ashland, Ohio that "has approximately 180 employees." (*Id.*, ¶¶ 8-9.) At this facility, Defendant "owned and operated a machine known as the 501 Automat[on] Labeler ('501 Labeler')." (*Id.*, ¶ 10.) The 501 Labeler "is electronically powered and actuated by push button." (*Id.*, ¶ 11.) It "meshes a label and a corrugated cardboard blank with glue to make solid adhesion before going to a die cutter or folder glue machines." (*Id.*, ¶ 12.) "The corrugated blanks feed in on a conveyor line up to an Extendo conveyor

that automatically loads the blanks onto the conveyor up to an arm that spreads the blanks out evenly and automatically feeds the blanks into the 501 Labeler's infeed." (*Id*., ¶ 13.)  "The infeed then aligns the blanks to make sure they are pulled into the feed rollers appropriately where they are automatically pulled through the machine where the pre-glued label is adhered to the corrugated blank." (*Id*., ¶ 14.)

"The Original Equipment Manufacturer (OEM) guard that came on the 501 Labeler went across the feed roll section and left space for the product to enter." (*Id*., ¶ 15.)  "The OEM guard on the 501 Labeler protected employees who were working on or around the machine from injury from a pinch point but permitted corrugated blanks that were being used for production of single wall cardboard boxes to feed into the machine."[1]  (*Id*., ¶ 16.)  Previously, the OEM guard "complied with OSHA regulations and other safety standards and regulations concerning guarding of pinch points." (*Id*., ¶ 18.)  However, sometime after the 501 Labeler was installed in 2005 but before Plaintiff was injured in 2023, Defendant "removed the OEM guard." (*Id*., ¶¶ 11, 19).  Specifically, Defendant altered the OEM guard and widened the pinch point gap to at least one inch.  (*Id*., ¶¶ 20, 22.) Defendant made this change "to allow for thicker corrugated blanks to feed into the machine as thicker corrugated blanks were needed for the production of double wall cardboard boxes." (*Id*., ¶ 21.)  As a result of this change, "the OEM guard [was] no longer compliant with OSHA regulations and other safety standards and regulations concerning the guarding of pinch points." (*Id*., ¶ 23.) Defendant "knew or should have known that its conscious decision to change the OEM guard of the pinch point was dangerous and was a violation of OSHA regulations and other safety standards and regulations." (*Id*., ¶ 24.)

Plaintiff was Defendant's employee.  (*Id*., ¶ 26.)  Plaintiff was "instructed, trained, required,

---

[1] "A pinch point refers to a dangerous area where a part of the body may get caught between stationary and moving parts." (*Id*., ¶ 17.)

2

directed, assign[ed], requested, allowed, supervised, shown, told, expected and/or encouraged" by Defendant "to perform work activities near the unguarded pinch point of the 501 Labeler."  (*Id.*, ¶ 37.)  One of Plaintiff's assigned job duties and/or tasks was working on a platform dangerously close to the 501 Labeler's unguarded pinch point while the machine was operating.  (*Id.*, ¶ 38.)

On October 20, 2023, a supervisor told Plaintiff "to climb up on the platform and work on the 501 Labeler and work near the unguarded pinch point" while the machine was operating.  (*Id.*, ¶¶ 27.) Earlier that day, maintenance workers had spent several hours working on the 501 Labeler based on work orders that employees submitted about the machine shocking or electrocuting them.  (*Id.*, ¶¶ 30-31.)  "In the process of working on the 501 Labeler, [Plaintiff] felt like she was being shocked and/or electrocuted and her left hand touched the 501 Labeler, her left hand got caught in the unguarded pinch point of the machine, and her hand and arm started to be pulled into the moving parts of the 501 Labeler."  (*Id.*, ¶ 32.)   Plaintiff tried to free herself but could not.  (*Id.*, ¶ 33.)  Instead, the 501 Labeler pulled her left hand into its moving parts, severing her fingers and tearing the flesh from her fingers and hand.  (*Id.*)  Plaintiff called for help.  (*Id.*, ¶ 34.)  Someone shut down the machine and called 911.  (*Id.*, ¶¶ 34-35.)  Plaintiff was taken to the hospital for medical treatment.  (*Id.*, ¶ 35.)  She suffered serious injuries, including the amputation of three fingers on her left hand.  (*Id.*, ¶ 36.)

Prior to the accident, Defendant had knowledge that employees could be injured by pinch points because on September 23, 2020, another label helper suffered a laceration to her right hand while working with a similar label machine.  (*Id.*, ¶ 25.)[2]  Defendant also "knew or should have known that operators of the 501 Labeler had complained about getting shocked and/or electrocuted

---

[2] Before the accident, OSHA had issued citations to Defendant "for violating various safety regulations" and recommended that Defendant be assessed fines.  (Doc. No. 1*, ¶ 49.)

while operating the machine." (*Id*., ¶ 29.)  Defendant "knew or should have known that operators of the 501 Labeler were told to wear rubber gloves while operating the machine because of the problems with operators getting shocked and/or electrocuted." (*Id*., ¶ 30.)

"Despite this knowledge, [Defendant] failed to comply with the applicable federal, state and industry safety standards in an effort to prevent injuries to workers who would be working near pinch points on machines like the 501 Labeler." (*Id*., ¶ 45.)  "Despite knowledge of the above-mentioned facts concerning the dangerous machine and dangerous condition, [Defendant] still required workers like [Plaintiff] to work near the dangerous machine and dangerous condition involved in this incident." (*Id*., ¶ 47.)  After Plaintiff was injured, OSHA issued citations to Defendant "for violating various federal safety regulations" and recommended again that Defendant be assessed fines. (*Id*., ¶ 48.)

### A.  Procedural History

On October 20, 2025, Plaintiff filed her Complaint, that set forth two counts: (I) Employer Intentional Tort Claim ("Count I") and (II) Declaratory Judgment ("Count II"). (*Id*., ¶¶ 50-57.)[3]  On December 16, 2025, Defendant filed the Motion. (Doc. No. 8.)  On January 13, 2026, Plaintiff filed the Opposition to which Defendant replied on January 27, 2026. (Doc. Nos. 10, 11.)  Accordingly, the Motion is ripe for review.

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"

---

[3] Plaintiff brings this action under this Court's diversity jurisdiction.  *See* (Doc. No. 1, ¶¶ 1-4.)

4

*Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  For purposes of Rule 12(b)(6), "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."  *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citation and quotation marks omitted).

The measure of a Rule 12(b)(6) challenge — whether the Complaint raises a right to relief above the speculative level — "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'"  *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly,* 550 U.S. at 555–56).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.'  Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting in part *Erickson v. Pardus*, 551 U.S. 89 (2007)).  Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not

5

unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

### III.    Analysis

In the Motion, Defendant asks this Court to dismiss the Complaint with prejudice.  (Doc. No. 8, PageID# 29.)  For the reasons set forth below, the Court denies the Motion as to Count I and grants the Motion as to Count II.

### A.  Count I: Employer Intentional Tort Claim

In Count I, Plaintiff alleges that Defendant intentionally injured her when it widened the safety guard on the 501 Labeler.  (Doc. No. 1, ¶¶ 50-53.)  Defendant argues that Plaintiff fails to satisfy the heightened pleading standard for Ohio's employer intentional tort statute.  (Doc. No. 8-1, PageID# 32) (citing Ohio Rev. Code § 2745.01).  Specifically, according to Defendant, Plaintiff fails to show that Defendant intended to injure her, especially since Plaintiff alleged Defendant's decision to modify the guard was for business purposes.  (*Id*., PageID# 35.)  Defendant also argues that Plaintiff is not entitled to a rebuttable presumption that Defendant intended to cause injury because that presumption applies only when an employer physically removed the guard whereas here Defendant only modified it.  (*Id*., PageID# 39.)  Finally, Defendant contends that even if such a presumption applies, it does not eliminate the statutory requirement of pleading an intent to injure and Plaintiff has failed to allege that Defendant acted with an intent to injure her.  (*Id*., PageID# 40.)  In the Opposition, Plaintiff argues that (1) she has alleged a deliberate intent because Defendant knew the danger the modification posed and (2) having a business motive does not negate deliberate intent.  (Doc. No. 10, PageID#s 55-61.)  Plaintiff also argues that she properly invoked the rebuttable presumption because she showed that Defendant removed the guard.  (*Id*., PageID# 62.)  In the Reply,

Defendant reiterates that (1) the guard was not "removed" and that (2) Plaintiff still fails to plead deliberate intent.  (Doc. No. 11, PageID#s 73, 76.)  The Court will address these arguments in turn below.

Section 2745.01 of the Ohio Revised Code reads in relevant part that:

(A)    In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.
(B)    As used in this section, "substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.
(C)    Deliberate removal by an employer of an equipment safety guard or deliberate misrepresentation of a toxic or hazardous substance creates a rebuttable presumption that the removal or misrepresentation was committed with intent to injure another if an injury or an occupational disease or condition occurs as a direct result.

Ohio Rev. Code § 2745.01.

According to the Ohio Supreme Court, the Ohio General Assembly, in enacting the instant statute, "intended to limit claims for employer intentional torts to situations in which an employer acts with the 'specific intent' to cause an injury to another." *Houdek v. TyssenKrupp Materials N.A., Inc.*, 983 N.E.2d 1253, 1258 (Ohio 2012).  Thus, under section 2745.01 of the Ohio Revised Code, "absent a deliberate intent to injure another, an employer is not liable for a claim alleging an employer intentional tort, and the injured employee's exclusive remedy is within the workers' compensation system." *Id.*; *see also Spangler v. Sensory Effects Powder Sys., Inc.*, 2015 WL 1505766, at *3-4 (N.D. Ohio Apr. 1, 2015).

To that end, under § 2745.01, "[a]n employee asserting an employer intentional tort claim is subject to a 'heightened standard of review' under a Rule 12(b)(6) motion to dismiss." *O'Connor v.*

*Nationwide Child.'s Hosp.*, 219 F. Supp. 3d 673, 680 (S.D. Ohio 2016) (quoting *Byrd v. Faber*, 565 N.E.2d 584, 589 (Ohio 1991)).  This heightened pleading standard is due to "the need to deter the number of baseless claims against employers, the importance of preventing every workplace injury from being converted into an intentional tort claim, and the goal of facilitating the efficient administration of justice."  *Byrd*, 565 N.E.2d at 589.  Ohio's "heightened pleading standard for employer intentional torts is substantive law," and thus, applied by federal courts sitting in diversity. *Downey v. Reich Installation Servs., Inc.*, 2009 WL 2922262, at *3 (N.D. Ohio Sept. 8, 2009) (noting that "[t]he heightened pleading standard functions much in the same way as other 'procedural' rules that have been held to be substantive in nature, such as state statute of limitations").

Accordingly, the Court will analyze Plaintiff's Complaint under Ohio's heightened pleading standard for alleged intentional torts committed by employers.  A claim of intentional tort against an employer will be dismissed unless the "complaint alleges facts showing that the employer: (1) specifically desired to injure the employee; or (2) knew that injury to an employee was certain or substantially certain to result from the employer's act and despite this knowledge, still proceeded." *Mitchell v. Lawson Milk Co.*, 532 N.E.2d 753, 756 (Ohio 1988). Because the statute requires a deliberate intent to injure, or knowledge that an injury was substantially certain to occur, an allegation that "the accident could have been avoided had certain precautions been taken ... is still insufficient to satisfy the statute." *Spangler*, 2015 WL 1505766, at *4.

First, this Court rejects Defendant's argument that Plaintiff fails to adequately allege that Defendant intended to injure her.  (Doc. No. 8-1, PageID# 35.)  Every case that Defendant cites in support can be distinguished from this one and indeed, several of them involved a disposition in favor of the employer, not based upon a determination that the complaint's allegations did not meet Ohio's

heightened pleading standard so as to require dismissal of the complaint, but at the summary judgment stage or after a trial and appeal.  To begin, some of the cases that Defendant cites in support dealt with whether a device constituted an equipment safety guard under the statute.  *See* (*Id*., PageID#s 39, 42) (citing *Zimmerman v. Russ Steamer Serv., LLC*, 2025 WL 552867, *5 (S.D. Ohio Feb. 19, 2025) (dismissing plaintiff's employer intentional tort claim as defroster device and spinner knob did not constitute equipment safety guard, which is required "to raise a rebuttable presumption of the employer's intent to injure"); *Hewitt v. L.E. Myers Co.*, 981 N.E.2d 795, 801-02 (Ohio 2012) (reversing trial court's denial of employer's motion for direct verdict because rubber gloves did not constitute equipment safety guard under the statute)).  Nowhere in the Motion does Defendant attempt to argue that the safety guard did not constitute an equipment safety guard, so those cases are distinguishable from the instant matter.

Other cases which Defendant cites can be distinguished because in those cases the courts found that the plaintiff's injury was not certain to follow defendant's purported failure to maintain or furnish the equipment in question.  (*Id*., PageID#s 36, 38) (citing *Mitchell*, 532 N.E.2d at 756 (affirming trial court's dismissal of plaintiff's employer intentional tort claim as it was not substantially certain that the plaintiff would be the victim of an armed robbery as result of defendant's lack of security devices); *Cruz v. W.*, 2020 WL 6342652 (Ohio App. 8th  Dist. Oct. 29, 2020) (affirming trial court's grant of summary judgment as to plaintiff's employer intentional tort claim where plaintiff's injury was "not the result of some defect or malfunction in profile gate").

The remaining cases that Defendant cites can be distinguished because they center around a defendant's omissions rather than its affirmative acts.  In each of those cases, the district court dismissed the plaintiff's claim because it found that the defendant's omission or failure to act, either

9

by failing to maintain machinery or failing provide the plaintiff with proper protective equipment, did not constitute an affirmative act sufficient to demonstrate the defendant's deliberate intent to injure its employee.  In *Spangler v. Sensory Effects Powder Systems*, the plaintiff alleged that his employer "knowingly and intentionally subjected him to machines and equipment that did not have required explosion and fire protection mechanisms," and that "he was required to work without adequate fire protection equipment and personal protective equipment." (Doc. No. 8-1, PageID# 38) (citing *Spangler*, 2015 WL 1505766, at *4-5).  The court construed the plaintiff's claims to be allegations of an unsafe work environment—in other words, that if his employer had taken certain precautions, the plaintiff's injury could have been prevented.  *Spangler*, 2015 WL 1505766, at *4-5. The court concluded that the plaintiff's claims failed under Ohio's heightened pleading standard because the plaintiff did not allege that his employer had the "specific intent" to deliberately injure him. *Id.* (citing *Houdek*, 983 N.E.2d at 1258-59).  Similarly, in *Downey v. Reich Installation Services*, another court in this district held that the plaintiff failed to plausibly allege an employer intentional tort because the plaintiff only alleged that his employer knowingly required the plaintiff to operate machinery without proper safety equipment.  (Doc. No. 8-1, PageID# 38) (citing *Downey*, 2009 WL 1416046, at *3 (N.D. Ohio May 19, 2009)).  In *Harris v. Ford Motor Company*, this Court dismissed the plaintiff's claim, finding that "[p]laintiff allege[d] only that [d]efendant required her 'to work with the [machine] without working safety guards in place and without other necessary safety equipment.'"  (*Id.*) (citing *Harris*, 2022 WL 7579833, *4 (N.D. Ohio Oct. 13, 2022) ("Because [p]laintiff's [c]omplaint alleges nothing more than the lack of necessary safety equipment, and the resulting unsafe working conditions, [p]laintiff's [c]omplaint fails.")) Defendant cites several other cases that rely on the same proposition.  (*Id.*, PageID#s 37-38.) (citing *O'Connor*, 219 F. Supp. 3d at

680 (dismissing the plaintiff's claims where plaintiff alleged that defendant "failed to maintain the elevator, which constitutes an omission, not an affirmative act"); *Bullis v. Sun Healthcare Group*, 2012-Ohio-2112, ¶ 3 (Ohio App. 2d Dist. 2012) (affirming dismissal of plaintiff's employer intentional tort claim where plaintiff sprained his ankle after he tripped and fell into a hole in the parking lot which defendant failed to repair); *Schiemann v. Foti Contracting*, 2013-Ohio-269, ¶ 4 (Ohio App. 8th Dist. 2013) (affirming trial court's grant of summary judgment as to plaintiff's employer intentional tort claim where defendant failed to provide plaintiff with a safety harness and construct a guardrail on the scaffolding); *Redding v. Truck Serv., Inc.*, 2023 WL 3995084, at *4 (N.D. Ohio June 14, 2023) (dismissing plaintiff's employer intentional tort claim where plaintiff alleged defendant permitted two workers exhibiting symptoms of COVID-19 to work without any protective gear); *Lucio v. Levy Env't Servs. Co.*, 173 F. Supp. 3d 558, 563 (N.D. Ohio), *aff'd,* 670 F. App'x 889 (6th Cir. 2016) (granting summary judgment as to plaintiff's employer intentional tort claim where plaintiff alleged defendant failed to provide adequate fall protection for its workers)); *Juhn v. Ford Motor Co.*, 2011 WL 13234643, at *4 (N.D. Ohio Jan. 7, 2011) (granting summary judgment and dismissing plaintiff's employer intentional tort claim "[b]ecause there is no evidence presented demonstrating that some safety device was installed and then removed"); *Bechtel v. Multi-Cast Corp.*, 252 N.E.3d 588, 595 (Ohio App. 6th Dist. 2024) (affirming the trial court's grant of summary judgment as "there [wa]s no testimony from any witness in this case that the removal of the device occurred at the direction of management"); and *Camara v. Gill Dairy, LLC*, 220 N.E.3d 257, 269 (Ohio App. 12th Dist. 2023) (reversing trial court's denial of summary judgment where "it was asserted that the end of the shaft guard had simply broken off as a result of ordinary wear and tear").

In this case, Plaintiff does not merely allege that Defendant failed to install a safety guard on

11

the 501 Labeler or equip Plaintiff with protective gloves.  She alleges that when the 501 Labeler was installed, it included a safety guard that "went across the feed roll section and left space for the product to enter," but, when Defendant chose to widen that guard, it functionally removed it.  (Doc. No. 1, ¶ 15.)  So, although Defendant correctly asserts that "allegations of a dangerous work environment or of the lack of necessary safety equipment are not enough to state a plausible claim," here Plaintiff has alleged *more* than that.  *Harris*, 2022 WL 7579833, at *4.

Second, this Court rejects Defendant's argument that "Plaintiff does not allege that [Defendant] lifted, pushed aside, detached, disabled, bypassed, or physically eliminated the guard." (Doc. No. 8-1, PageID# 39.) The Ohio Supreme Court has held that "'deliberate removal' of an equipment safety guard occurs when an employer makes a deliberate decision to lift, push aside, take off, or otherwise eliminate that guard from the machine."  *Hewitt*, 981 N.E.2d 801-02.  Defendant urges this Court to interpret "deliberate removal" to mean only physical removal.  (Doc. No. 11, PageID#s 74-76.)  Yet the Ohio Supreme Court includes the words "push aside," "bypass," or "otherwise eliminate" in its definition of "deliberate removal."  *See Hewitt*, 981 N.E.2d at 205 ("'[R]emoval' may encompass more than physically removing a guard from equipment and making it unavailable, such as bypassing or disabling the guard[.]")  Taking Plaintiff's allegations as true, this Court finds that Plaintiff has adequately alleged that Defendant deliberately removed the safety guard because widening it rendered it non-functional.  Plaintiff also alleged that Defendant had knowledge that widening of the safety guard was substantially certain to cause injury.  Furthermore, before the accident, Defendant knew that employees had been shocked and electrocuted while operating the machine and advised them to wear protective gloves.  On September 23, 2020, another

12

label helper suffered a laceration to her right hand while working with a similar label machine.[4]  For these reasons, the Court finds that Plaintiff has satisfied the statute's heightened pleading standard and has pled deliberate removal.

This Court also rejects Defendant's argument that it could not have a tortious motive because it modified the guard for business reasons.  (Doc. No. 8-1, PageID#s 37-38.)  Defendant does not support this proposition with any case law.  In *Berardelli v. Foster Wheeler Zack, Inc.*, "[p]laintiff was working as a boilermaker and was hired by [d]efendant to perform work on boilers at [d]efendant's electricity generating plant." *Juhn*, 2011 WL 13234643, at *4 (citing *Berardelli*, 2010 WL 3719275, *1 (S.D. Ohio Sept. 17, 2010)).  "Defendant constructed scaffolding around the work site for the workers['] protection which was used during the initial phase of the construction but was taken down during the later stages due to time constraints." *Id*.  There, the district court wrote:

> The key distinction, in the Court's view, is that scaffolding was used initially during the project but was then allegedly removed. Under these alleged circumstances, it is possible to conclude that the absence of scaffolding at the time of [p]laintiff's alleged injury amounts to the "[d]eliberate removal ... of an equipment safety guard...." This is not to say that a failure to install scaffolding in every instance will state a claim for relief under subsection (C).  Rather, in this limited instance, i.e., where [p]laintiff alleges that scaffolding was initially used as a safety device but was later deliberately removed by [d]efendant, [p]laintiff's claim may proceed.

*Id*.  (citing *Berardelli*, 2010 WL 3719275 at *5).  As in *Berardelli*, here, Plaintiff alleges that the 501 Labeler, in its original condition, had a working safety guard but that safety guard was functionally removed when Defendant widened it.  Thus, this claim can proceed.

---

[4] This Court rejects Defendant's argument that even if this presumption were to apply, Plaintiff has still not pled deliberate intent.  (Doc. No. 8-1, PageID# 40) (citing *Zimmerman v. Russ Steamer Serv., LLC*, , 2025 WL 552867, at *5 (S.D. Ohio Feb. 19, 2025) ("Therefore, even if the facts, as alleged, were sufficient to raise a rebuttable presumption of intent to injure under the employer intentional tort statute, Ohio Revised Code § 2745.01(C), her Complaint does not allege the the ultimate requirement that the employer acted with deliberate intent to injure her."))  The Court has reviewed the district court's decision in *Zimmerman* and finds that it does not support the argument which Defendant tries to assert.

Accordingly, the Court denies the Motion as to Count I.

## B.  Count II: Declaratory Judgment Action

The Court will now discuss Plaintiff's declaratory judgment action.  In Count II, Plaintiff alleges that Defendant "is self-insured for workers' compensation and has paid out money to [Plaintiff] pursuant to a statutory obligation to provide workers' compensations benefits (medical, indemnity payments, etc.) and will continue to do so in the future."  (Doc. No. 1, ¶ 56.)  Plaintiff alleges that a dispute exists as to "whether [Defendant] is entitled to enforce any subrogation right and/or right to reimbursement and recover any of the money it paid out to Plaintiff both in the past or into the future, from Plaintiff's recovery from [Defendant] pursuant to the employer intentional tort claim pursued in this case."  (*Id.*, ¶ 57.)

In the Motion, Defendant argues that Count II should be dismissed because the underlying tort cannot survive and even if it could survive, Plaintiff's declaratory judgment action does not present a justiciable case or controversy.  (Doc. No. 8-1, PageID# 41.)  In the Opposition, Plaintiff asserts that an actual controversy exists regarding subrogation and reimbursement rights and that the controversy is ripe for this Court's adjudication because this Court need not know how much Plaintiff might recover to determine whether that amount could be subject to subrogation.  (Doc. No. 10, PageID#s 66-67.)  Plaintiff also contends that resolving the subrogation issue now will promote judicial economy by (1) preventing piecemeal litigation and (2) improving transparency during settlement negotiations.  (*Id.*, PageID#s 67-68.)  In the Reply, Defendant argues that courts cannot issue advisory opinions and that "settlement leverage is not a substitute for Article III immediacy." (Doc. No. 11, PageID# 80.)  Having concluded that Count I survives, this Court will address only whether Plaintiff has standing to bring this claim and if Plaintiff has standing, whether this Court

should exercise its discretion to adjudicate this cause of action.

Under Article III of the United States Constitution, federal courts may exercise jurisdiction only if the parties have presented a live case or controversy. U.S. Const. Art. III, § 2. *See Commodities Export Co. v. Detroit Intern. Bridge Co.*, 695 F.3d 518, 525 (6th Cir. 2012). As the Sixth Circuit has explained, "[w]e have no power to offer an advisory opinion, based on hypothetical facts." *Id.* (citing *Fialka–Feldman v. Oakland Univ. Bd. of Trustees*, 639 F.3d 711, 715 (6th Cir. 2011)). Where a party seeks declaratory relief, "[t]he difference between an abstract question and a 'controversy'...is necessarily one of degree." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (internal quotation marks omitted). Thus, when faced with the "difficult task of distinguishing between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies," *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (internal quotation marks omitted), courts consider "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Golden*, 394 U.S. at 108 (internal quotation marks omitted). *See also MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007) (in determining whether a declaratory judgment action satisfies the case or controversy requirement, the question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."); *Commodities Export Co.*, 695 F.3d at 525.

This Court agrees with Defendant that Count II does not present a justiciable case or controversy because Count II is not yet ripe. Here, Plaintiff asks this Court to declare whether

Defendant can enforce a subrogation right as to what she might recover in this action, but a trier of fact has not yet found that Plaintiff is entitled to any damages.  Furthermore, Defendant has not yet asserted a subrogation right.  *See Zimmerman v. Russ Steamer Serv., LLC*, 2025 WL 552867, at *7 (S.D. Ohio Feb. 19, 2025) (where the court found that plaintiff lacked standing to bring the declaratory judgment action brought in relation to his employer intentional tort claim because the defendant had not asserted any indemnification rights).  At present, this Court does not know whether Plaintiff will recover anything from this action, and even if she does recover damages, the Court still does not know whether Defendant will assert subrogation rights over this award.  Thus, finding that any decision on the matter would be purely hypothetical, this Court dismisses Count II, finding that Plaintiff lacks Article III standing.

Assuming *arguendo* that Plaintiff has standing, this Court still declines to exercise jurisdiction over Count II.  If Count II was justiciable, the Court would next consider whether it should exercise jurisdiction over a parties' request for declaratory relief.  As the Supreme Court has explained, federal courts are not obligated to exercise subject matter jurisdiction in declaratory judgment actions.  *See Brillhart v. Excess Insurance Co. of Am.*, 316 U.S. 491, 494 (1942) ("[a]though the District Court had jurisdiction of the suit under the Federal Declaratory Judgments Act...it was under no compulsion to exercise that jurisdiction").  Rather, the Sixth Circuit considers five factors (the "*Grand Trunk* factors") to determine whether the exercise of Declaratory Judgment Act[5] jurisdiction is appropriate:

(1) whether the declaratory action would settle the controversy;
(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;

---

[5] The Declaratory Judgment Act provides, with certain exclusions not applicable here, that: "[I]n a case of actual controversy within its jurisdiction..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  28 U.S.C. § 2201(a).

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;"
(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
(5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (citations omitted).

*See also United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019).

Although the above formulation indicates the court should balance the five factors, the Sixth Circuit has never revealed the relative weight of the factors. *See United Specialty Ins. Co.*, 936 F.3d at 396. Instead, "[t]he relative weight of the underlying considerations of efficiency, fairness, and federalism will depend on facts of the case." *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014). The Sixth Circuit has noted, in weighing these factors, that "[d]istrict courts must be afforded substantial discretion to exercise jurisdiction 'in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and [the] fitness of the case for resolution, are peculiarly within their grasp.'" *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008) (quoting *Wilton v. Seven Falls Co.,* 515 U.S. 277, 289 (1995)).

The Court finds that, on balance, the *Grand Trunk* factors do not support the exercise of jurisdiction over Plaintiff's claim for declaratory relief. As to the first factor, adjudicating Count II will not settle the controversy because Plaintiff first must recover under Count I before the issue of Defendants subrogation rights arises. For this reason, too, exercising discretion over Count II would only be valuable in clarifying legal relations if the trier of fact finds that Plaintiff is entitled to relief under Count I. As to the third and fourth factors, there is no underlying state court proceeding, so these factors support issuing a declaratory judgment. As to the fifth and final factor, judicial economy might be best served if this issue was raised if and when Defendant seeks subrogation. Accordingly,

17

this Court's application of the *Grand Truck* factors cuts against issuing a declaratory judgment, and this Court dismisses Count II.

Accordingly, the Court grants the Motion as to Count II.

## IV.  Conclusion

For the reasons set forth herein, Motion to Dismiss Plaintiff's Complaint (Doc. No. 8) is granted in part and denied in part.  The Court denies the Motion as it applies to Count I and grants the Motion as to Count II.  Defendant shall file its answer as to Count I within twenty-one (21) days of the date of this order.

**IT IS SO ORDERED.**

     *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  August 11, 2026      U.S. DISTRICT JUDGE